Geoffrey SILL, Alan C. Cunningham, Scott E. Gibbs, Kenneth R. Cooper, Steven D. Weiss, Walter T. Champion, Jr., John M. Forcey, Kenneth A. Karpovich, Diane K. Lehnig, Caesar J. Muccari, David S. Oswald, and M. Dean Ross, Plaintiffs,

Richard A. Parkany, Joseph Schneller, John P. Yanak, Ellen Keyser and Paul Kostrow, Intervening Plaintiffs,

v.

The PENNSYLVANIA STATE UNIVERSITY, its Board of Trustees, G. Albert Shoemaker, Individually and as President of its Board of Trustees, H. Thomas Hallowell, Jr., Individually and as Vice President of its Board of Trustees, and Dr. John W. Oswald, Individually and as its President, Defendants.

Civ. No. 70–325.

United States District Court, M. D. Pennsylvania.

Sept. 25, 1970.

Thomas K. Gilhool, Philadelphia, Pa., for plaintiffs.

McNees, Wallace & Nurick, G. Thomas Miller, F. Murray Bryan, Harrisburg, Pa., Delbert J. McQuaide, William J. Schwartz, Jr., McQuaide, Blasko & Brown, State College, Pa., for defendants.

Patrick T. Ryan, Philadelphia, Pa., for amicus curiae—Pennsylvania State University Chapter of the American Association of University Professors.

## OPINION

NEALON, District Judge.

This action was instituted by twelve students at Pennsylvania State University (Penn State) against the Board of Trustees and the President of Penn State as a result of disciplinary action imposed on the students in June, 1970, following a campus disturbance in April, 1970.[1] Declaratory and injunctive relief is sought to redress alleged violations of the students' rights under the First, Fifth and Fourteenth Amendments of the Constitution. The motion of six students [2] for a temporary restraining order was denied on July 2, 1970, the date of the filing of the complaint. The motion of two of the students [3] for a preliminary injunction was denied on August 3, 1970, following a hearing on July 14, 1970. Sill v. Pennsylvania State University, 315 F.Supp. 125 (M.D.Pa. 1970). The case then proceeded to final hearing on August 19, 1970.

Four major issues are presented for determination: (1) whether the jurisdiction of the Court and the constitutional requirements of substantive and procedural due process apply only to those students who were dismissed or suspended and not to those who were placed on probation for varying periods of time; (2) whether the regulations under which the students were disciplined are unconstitutionally vague and overbroad on their face; (3) whether the appointment of a Special Disciplinary Panel by the Penn State Board of Trustees to hear the charges against the students in lieu of the existing discipli-

nary board was a violation of procedural due process; (4) whether the punishment imposed on the students by the President of Penn State is supported by substantial evidence.

In accordance with Fed.R.Civ.P. 52, I make the following:

## FINDINGS OF FACT

1. Penn State is a coeducational public institution of higher education consisting of a main campus at University Park, Centre County, Pennsylvania, and twenty-one campuses situated in various parts of the Commonwealth of Pennsylvania. It was created by the Pennsylvania Legislature in 1855 and operates under a "charter" which consists of various Legislative Acts and decrees of the Court of Common Pleas of Centre County, and is governed by a Board of Trustees consisting of thirty-two members.

2. Penn State operates on the quarterly term system, consisting of four equal semesters of classes. During the Fall, Winter and Spring Terms at the main campus, which cover the months from October to June, 21,000 undergraduate students and 4,000 graduate students are in attendance. During the Summer Term there are approximately 6,000 undergraduate students and a small, but undetermined, number of graduate students.

3. As with many other colleges and institutions in the United States, Penn State has experienced an increasing number of student disciplinary problems in recent years, especially on the main campus at University Park.

4. In late February, 1969, following a sit-in at "Old Main", the principal administrative building at University Park, Eric A. Walker, former President of Penn State, established a Special Ju-

---

1. Jurisdiction is predicated upon 28 U.S.C. § 1331; 28 U.S.C. §§ 2201, 2202; 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

2. Sill, Cunningham, Gibbs, Cooper, Weiss and Champion.

3. Sill and Weiss. At the hearing on the motion for a preliminary injunction, five

additional students were allowed to intervene as plaintiffs. Two of these intervenors, Parkany and Keyser, as well as four original plaintiffs—Cunningham, Cooper, Champion and Gibbs—also moved for a preliminary injunction, but withdrew their motions without prejudice at the conclusion of the hearing.

diciary Board (Board #1) to hear charges of disruption against approximately a half-dozen students. This Special Judiciary Board had no prior existence and was composed of three administrators, three faculty members, and three students, one of whom resigned at the time of the adoption of Board procedures.

5. One week later, President Walker requested the University Senate to establish a permanent disciplinary system for the adjudication of future charges against students.

6. On March 11, 1969, the 240-member University Senate, which is primarily a faculty body with some student and administrative participation, voted to establish an Ad Hoc Committee on Disruption (Committee #1) to review the problems of campus disruption and to recommend appropriate regulations to the Senate. The Senate's Constitution provides that regulations affecting students are within its legislative jurisdiction, "* * * subject to the revision and all orders of the Board of Trustees."

7. On April 1, 1969, the University Senate voted its approval of a Statement on Open Expression and Disruption which now appears as Part II of Penn State's "Guide to University Regulations Concerning Student Affairs, Conduct and Discipline, 1969–1970." This Statement had been prepared by the Ad Hoc Committee on Disruption (Committee #1) and contains the principal regulations under which all of the plaintiffs were charged and which they now contend to be vague and overbroad.

8. On April 1, 1969, the University Senate established an Ad Hoc Committee on Special Judiciary Boards (Committee #2) to develop a disciplinary system for the University.

9. In April, 1969, after holding several hearings concerning the February, 1969, sit-in, the Special Judiciary Board (Board #1) made its recommendations to President Walker, which he accepted. As a result, four students were placed on disciplinary probation and one student received a letter of warning.

10. On August 5, 1969, the University Senate established a Temporary Judiciary Board (Board #2) to adjudicate disciplinary problems pending receipt of the recommendations of the Ad Hoc Committee on Special Judicial Boards (Committee #2). The Temporary University Judiciary Board (Board #2) was composed of two faculty members, two undergraduate students, one graduate student, and one administrator. No cases were ever presented to this Board for consideration.

11. On March 3, 1970, the University Senate accepted the recommendation of the Ad Hoc Committee on Special Judicial Boards (Committee #2) and established a permanent University Judiciary Board (Board #3) to hear cases of disruption. The composition of this Board was as follows: four Panels totaling forty members, equally divided among undergraduate students, graduate students, faculty members, and administrators.

12. On April 10, 1970, the Penn State Board of Trustees refused to accept this permanent University Judiciary Board (Board #3) and reinstated the prior disciplinary system (Board #2 —the Temporary University Judiciary Board) pending the Trustees' determination of a proper disciplinary system at Penn State.

13. On April 14, 1970, at approximately 2:00 P. M., a group of students, mostly black and numbering 60 to 75, entered the Shields Building which houses the Bursar's Office, the student loan office, the room assignment office and the registration office. Although there was no physical violence, the administrative functions of these offices ceased and were interfered with until closing time when the students left the building.

14. On April 14, 1970, Penn State sought and was granted an ex parte preliminary injunction by Honorable R. Paul Campbell, President Judge of the Centre County Court of Common Pleas, restraining ten named students and forty John Does from "(o)bstructing, hindering or attempting to obstruct or

hinder, in any manner, whether or not overt force and violence is committed or threatened to be committed, any person or persons from free ingress and egress to said Shields Building or any other premises or property of the University." Hearing on the injunction was fixed for April 20, 1970.

15. On April 15, 1970, The Coalition for Peace, a campus group, conducted a noon rally in front of Old Main, the principal administrative building at University Park and one of the customary campus locations for student gatherings, rallies and demonstrations, after which there was a march to the Ordnance Research Laboratory. The march did not hinder normal Laboratory activities nor did Penn State officials interfere with the rally and march in any way.

16. At about 1:30 P.M., after the march, a portion of the group, estimated at 200 to 500, returned to Old Main, entered the building and remained there. The operations of the offices in the building were disrupted by the students as some ran throughout the building, took the fire hoses down, broke into the President's locked office, closed the Old Main computer center, broke several vending machines, ordered administrators out of the building, engaged in shoving and pushing two administrators, and refused to leave the building, despite requests to do so.

17. At about 4:00 P.M., a Centre County Deputy Sheriff attempted to, and did, read the injunction obtained the day before as a result of the Shields Building demonstration to the crowd assembled in the center hall of Old Main. The noise and confusion from the crowd and the interference from the squeal of a public address system used by one of the students was so great that the reading of the injunction was unintelligible to those who were in a position to hear it and inaudible to most of those in the building. At this time, some copies of the text of the injunction were distributed to those nearby.

18. During the afternoon hours, several faculty members and administrators mingled with, and spoke to, the students, requesting them to leave Old Main.

19. At about 6:00 P.M., Penn State obtained a Writ of Attachment from the Centre County Court of Common Pleas for violation of the injunction issued on April 14, 1970. Named were twelve individuals and one hundred John Does. At 7:50 P.M., the Pennsylvania State Police arrived at Old Main and announced that those remaining after two minutes would be arrested. Some left and others did not. At about 8:00 P.M., three hours after the building normally closed, those remaining were removed from the building and taken to the Centre County Jail. At this time, fifteen State Policemen were injured in the melee which developed as those arrested were taken to waiting buses. Eight required hospital treatment.

20. On April 20, 1970, President Walker announced that violations of Penn State regulations arising out of the events of April 14 and 15, 1970, would be dealt with by the Temporary University Judicial Board (Board #2). Beginning at 10:45 on the evening of April 20, and continuing until the early hours of April 21, the main campus of Penn State experienced many fire-bombing and window-breaking incidents at several buildings, including a stoning attack on the home of President Walker, forcing him and his wife to flee. None of the plaintiffs, however, is charged with performing or participating in any of these incidents.

21. On April 21, 1970, the State Police returned to the main campus to arrest certain students for whom they had warrants. During their presence on the campus, stones and other missiles were thrown at them and their buses, causing injury to one officer. Several students were then arrested and taken to the Centre County Jail.

22. On April 23, 1970, the Penn State Board of Trustees, meeting in special session at the Hilton Hotel, Pittsburgh, Pennsylvania, established a Special Disciplinary Panel (Board #4) "* * * to serve as a fact-finding

panel to investigate charges against certain students and make recommendations to the President." The Board of Trustees also empowered the President and his designated representatives to summarily suspend any student who engaged "in disruptive and/or destructive activity" subsequent to April 23, 1970.

23. Accordingly, the Board of Trustees appointed the following to the Special Disciplinary Panel (Board #4), popularly identified as the Woodside Panel: Honorable Robert E. Woodside, former Judge of the Pennsylvania Superior Court, Chairman; Honorable Genevieve Blatt, former Pennsylvania Secretary of Internal Affairs, and William T. Coleman, Esq., a prominent Philadelphia lawyer.

24. Shortly thereafter, President Walker created the disciplinary board presently in operation at Penn State. It is composed of two students and three faculty members and is popularly known as the Palladino Panel (Board #5).

25. On May 5, 1970, the University Senate adopted a Resolution submitted by its Committee on Undergraduate Student Affairs, which called upon the Board of Trustees or its representatives to meet with a Senate Committee for consultations concerning the Trustees' objections to the establishment of Board #3 and to draft a new acceptable plan. The Senate further urged the Board of Trustees to "* * * recognize and accept the jurisdiction of the Temporary (University) Judicial Board (Board #2) established by the Senate August 5, 1969, to deal with major cases of alleged disruptive activity," thereby vacating the appointment of the Woodside Panel.

26. On May 16, 1970, a series of meetings over two days occurred between the representatives of the Board of Trustees and the Senate. In a public statement issued at the conclusion of the meetings, the representatives agreed that the Temporary University Judiciary Board (Board #2) created by the Senate in August, 1969, could not act quickly enough to resolve the disciplinary charges. It was further agreed that the Special Disciplinary Panel (Woodside Panel) appointed by the Board of Trustees offered the best possibility for a fair, impartial and expeditious handling of the charges. These conclusions were based upon the slow progress of the Special Judiciary Board (Board #1) which operated in the Spring, 1969, and which was similar to the Temporary University Judiciary Board (Board #2); the feeling that membership changes in the Temporary University Judiciary Board (Board #2) were necessary and the desire to have trained legal minds hear the evidence and arrive at a speedy result.

27. The Woodside Panel (Board #4) conducted its hearings on May 18, 19 and 20, 1970. Rules of procedure were adopted by the Panel and are attached to this Opinion in the Appendix.

28. All of the plaintiffs in this action were charged with violating Section II(A) of The Pennsylvania State University "Guide to University Regulations Concerning Student Affairs, Conduct and Discipline, 1969–1970." All, except Sill and Weiss, were also charged with violating Rules W-11 and W-15 of The Pennsylvania State University "Senate Policies and Rules for Undergraduate Students, 1969–1970."

29. Section II(A) of the "Guide to University Regulations Concerning Student Affairs, Conduct and Discipline, 1969–1970" states as follows:

"A. STATEMENT ON OPEN EXPRESSION AND DISRUPTION

1. As an academic community consisting of students, faculty, administration, and a board of trustees, The Pennsylvania State University is committed to the protection and preservation of the free search for truth; the freedom of thought, inquiry, and speech; and the freedom to hear, examine, and debate alternative theories, data, and views. These are fundamental rights which must be practiced, protected, and promoted by this University.

2. It is essential in the University that channels of communication be open, effective, and accessible to all members of the academic community.

3. Acknowledging that the process of communication may include various forms of individual and collective expression, the University recognizes the right of lawful assembly and demonstration. However, a University dedicated to free inquiry and discussion cannot sanction any interference with or destruction of its responsibilities. The regular and essential operation of the University is construed to include, but is not limited to, the operation of its offices, classrooms, laboratories, research facilities, and the right of access to these and any other physical accommodations used in the performance of the teaching, research, and administrative functions and related adjunct activities of the University.

4. Disruption is an action or combination of actions by an individual or a group which unreasonably interferes with, hinders, obstructs, or prevents the regular and essential operation of the University or infringes upon the rights of others to freely participate in its programs and services.

5. It is the responsibility of University officials to initiate action to restrain or prohibit behavior which threatens the purposes or the property of the University or the rights, freedoms, privileges, and safety of the personnel of the academic community."

30. Rules W-11 and W-15 of the "Senate Policies and Rules for Undergraduate Students, 1969–1970" state as follows:

"W–11. The University regards as serious offenses all acts of unethical, immoral, dishonest, or destructive behavior, as well as violations of University regulations as set forth by the *Student Handbook* and the *Senate Policies and Rules for Undergraduate Students*. Any charges under this rule must cite a specific alleged offense or offenses. No student shall be subject to discipline solely under a general charge of unethical, immoral, dishonest, or destructive behavior.

Students who are found guilty of having committed an offense under paragraph 1 of this rule may be subject to disciplinary action. The right to dismiss a student is reserved to the President of the University."

"W–15. Details of Senate regulations for undergraduate students shall be embodied in a *Guide to University Regulations Concerning Student Affairs, Conduct, and Discipline* which shall be given to each student entering the University. Procedural details contained in this guide may differ among the several campuses."

31. Proper notice of the specific charges and of the time and place of the Panel's hearings were given to each of the persons charged with violations of University regulations.

32. Altogether the Panel heard charges brought by Penn State against thirty-nine students.

33. Plaintiffs Champion, Cunningham, Gibbs, Keyser, Parkany, Forcey and Karpovich made no appearance before the Woodside Panel. Plaintiffs Sill, Cooper, Weiss, Kostrow, Lehnig, Muccari, Oswald, Ross, Yanak and Schneller appeared before the Panel, represented by counsel, but subsequently withdrew when their challenge to the jurisdiction of the Panel was denied by a divided vote (Attorney Coleman, dissenting).

34. On or about June 15, 1970, the Woodside Panel submitted its written report to the President, summarizing its factual findings and containing recommendations that seven students be dismissed; three students be suspended for four terms; two students be suspended for two terms; one student, who had withdrawn, be permanently denied readmission; four students, who had withdrawn, be refused readmission for at least one year; sixteen students be placed on probation for two years; one student be placed on probation for one year; two students be placed on proba-

tion until graduation; one student be given a letter of warning, and the charges against two students be dropped. Attorney Coleman filed a separate report, recommending disciplinary action for only nine students ranging from letters of warning to suspension for one term.

35. President Walker accepted the recommendations of the Woodside Panel and on June 19, 1970, informed each of the students having been charged with disruption of the operations of Penn State that the disciplinary action suggested by the Panel would be imposed "effective immediately."

36. In his letter of notification to each student, President Walker also provided each the opportunity to submit additional information to him by June 26, 1970. The students could either submit a written statement or they could have an interview with a member of President Walker's staff. The President promised a decision on any additional information by the first of July, 1970.

37. Plaintiffs Sill, Cunningham, Cooper, Weiss, Karpovich and Parkany took advantage of President Walker's offer and submitted additional information. All but Karpovich did so through an interview with a member of the President's staff.

38. On June 30, 1970, the day upon which Eric A. Walker retired as President of Penn State, he informed each of these plaintiffs that his decision of June 19, 1970, would not be altered.

39. The specific punishment imposed on each of the plaintiffs is as follows: Dismissal—Sill, Cunningham, Cooper, Weiss and Champion; Suspension for four terms—Gibbs and Keyser; Suspension for two terms—Parkany; Probation for two years—Yanak, Forcey, Karpovich, Kostrow, Lehnig, Muccari,

Oswald and Ross; and Probation until graduation—Schneller.

40. On July 1, 1970, Dr. John W. Oswald succeeded Eric A. Walker as President of Penn State.

## DISCUSSION

The law applicable to students' rights while attending a public school[4] has developed rapidly in recent years and certain controlling principles have emerged. The States and school administrators have comprehensive *authority,* consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Similarly, University administrators have the *responsibility* to control and regulate the conduct and behavior of students which tend to impede, obstruct or threaten the achievement of a University's educational goals. Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463, 472 (1967); Jones v. State Board of Education, 279 F. Supp. 190, 205 (M.D.Tenn.1968), aff'd., 407 F.2d 834 (6th Cir. 1969). This authority over the student, while comprehensive, is not absolute and a student's constitutional rights must be recognized and " * * * applied in light of the special characteristics of the school environment." Tinker v. Des Moines Community School District, supra, at 506, 89 S.Ct. at 736. A student may express his opinions, even on controversial subjects, if he does so without materially or substantially interfering *with appropriate discipline* in the operation of the school, and without colliding with the rights of others. Tinker v. Des Moines, supra; Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966). Nevertheless, in or out of the University, the

---

4. The Fourteenth Amendment applies to State action and not to private schools unless acting "under color of state law." Brown v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir. 1961); Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y.1968). See generally, R. M. O'Neil, Private Universities and Public Law, 19 Buffalo L.Rev. 155 (1970).

First Amendment does not require that persons with opinions or beliefs can express them at anytime, and at any place, whenever and however and wherever they please. Cox v. State of Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L. Ed.2d 487 (1965); Adderley v. State of Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Therefore, a State University, in order to create a suitable climate for study and to maintain appropriate discipline, may impose reasonable and non-discriminatory regulations of time, place and manner even on pure speech. See C. A. Wright, Constitution on the Campus, 22 Vanderbilt Law Review, 1027, 1039 (1969).[5] "The rights of freedom of assemblage and freedom of expression must not be exercised in such a way as to interfere with the operation of classrooms and laboratories, with the availability and use of libraries and other facilities, or with the conduct of the university's administrative responsibilities. Reasonable regulations to prevent such interference is clearly within the rule-making jurisdiction of the University." Sherry, Governance of University: Rules, Rights and Responsibilities, 54 Calif.L.R. 27 (1966). However, one point should be made perfectly clear! While freedom of expression and freedom of assembly are to be carefully protected from unwarranted University interference, *action* is quite different as it "carries no first amendment shield and can be regulated in any way that the public health, safety, morals, and welfare require." Wright, supra, at 1039. In addition, certain forms of *conduct mixed with speech* may be regulated or prohibited. "The most classic of these was pointed out long ago by Mr. Justice Holmes: 'The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing panic.' Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470. A man may be punished for encouraging the commission of a crime, Fox v. Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573, or for uttering 'fighting words', Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S. Ct. 766, 86 L.Ed. 1031." Cox v. Louisiana, supra, at 563, 85 S.Ct. at 480. A course of conduct is not entitled to First Amendment immunity merely because the conduct was initiated, evidenced or carried out by means of language, either spoken, written or printed. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L. Ed. 834 (1949). Consequently, when "speech" and "non-speech" elements are combined in the same course of conduct, the non-speech element can justify incidental regulations on First Amendment freedoms. United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). These limitations, in some instances, may be more appropriate on a university campus than in the non-university society because of the selective purpose and the special characteristics of the school environment referred to in Tinker. Finally, Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed. 2d 228 (1968). The judiciary must exercise restraint in questioning the wisdom of specific rules or the manner of their application, since such matters are ordinarily the prerogatives of school administrators rather than the Courts. Barker v. Hardway, 283 F.Supp. 228 (D.C.W.Va.), aff'd., 399 F.2d 638 (4th Cir. 1968). On the other hand, the vigilant protection of constitutional freedom is nowhere more vital than in the com-

---

5. We need not concern ourselves with the question of whether a State University has the "inherent" power of discipline, as the matter at issue here involves alleged violations of specific regulations promulgated prior to the demonstration.

In this regard, the Fifth Circuit in Bayless v. Martine, 430 F.2d 873 (5th Cir. 1970), has held that the test for determining the validity of an ad hoc regulation would be stricter than the test for a general one.

munity of American schools. Epperson v. Arkansas, supra; Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960). With these guidelines as a starting point, we move to the specific issues raised in this action.

## I. JURISDICTION AND DUE PROCESS APPLICABILITY TO STUDENTS NOT SEVERELY DISCIPLINED

At the outset, we are confronted with Penn State's argument that those plaintiffs who were not dismissed or suspended, but merely placed on probation, have not been aggrieved to the degree that they can claim deprivation of their constitutional rights. There is persuasive authority to support this position. In the now recognized landmark case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), in which it was held that due process requires notice and some opportunity for a hearing before students *are expelled* at a tax-supported college, the Court noted that " * * * no one can question that *the right to remain at the college* in which plaintiffs were students in good standing is an interest of extremely great value." 294 F.2d at 157 (Emphasis supplied). The United States District Court for the Western District of Missouri adopted a General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (W.D.Mo. 1968), in which it recognized that "(t)he discipline of students in the educational community is, in all but the case of irrevocable expulsion, a part of the teaching process. * * *" Professor Wright opines that the Courts will distinguish severe penalties from mild penalties and will require formal procedures if there is to be expulsion or suspension for any significant time. Wright, supra, at 1071. He further acknowledges that if a school must establish a disciplinary system that meets constitutional standards for every situation where a student is charged with an infraction, the institution itself would be brought to a halt. Wright, supra, at 1083. In addition to the enormous burden this would place on school administrators, it would tend to make the Courts Super-Disciplinary Boards; could lead to judicial intrusion in matters of special academic expertise; could weaken the dominant position educators must possess in their relationship with students; could deprive them of the power to impose punishment as a part of their guidance and counseling function, and, practically speaking, would inundate the Courts with de minimis lawsuits.

With reference to the instant case, I conclude that probationary plaintiffs have not been aggrieved in the constitutional sense so as to challenge the regulations here involved, the procedure followed, or the punishment imposed. Being placed on probation or being denied certain school privileges does not, in my view, rise to the level of the deprivation of a right secured by the Constitution requiring judicial relief.

## II. VAGUENESS AND OVERBREADTH

It is well established that a law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. Baggett v. Bullitt, 377 U.S. 360, 367, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). Furthermore, this "void for vagueness" doctrine has also been applied to determine if the statutory language is "overbroad", that is, could a reasonable application of its sanctions include conduct protected by the Constitution? Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The important question for our purposes is whether the vagueness and overbreadth standard applies with equal force to student regulations at a State University. The tenor of the cases appears to recognize that the doctrine is

applicable to student regulations, but not with the same specificity that is required of State criminal statutes. Even the opinion of Judge Doyle at the District Court level in Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wisc.1968), aff'd., 418 F.2d 163 (7th Cir. 1969), on which plaintiffs heavily rely, noted that the doctrine applied "in some measure" to university regulations and, on appeal, the Seventh Circuit Court of Appeals expressly held that university codes of conduct are not required to satisfy the same rigorous standards as criminal statutes. 418 F.2d at 168. Similar reasoning has been employed in Norton v. Discipline Committee, 419 F.2d 195, 200 (6th Cir. 1969); Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969); Jones v. State Board of Education, supra, and Siegel v. Regents of University of California, 308 F.Supp. 832, 836 (N.D.Cal.1970). The Report of the American Bar Association Commission on Campus Government and Student Dissent (1970), advises against detailed codes of conduct comparable to criminal statutes and recommends rules which will provide fair notice of what is expected and what is forbidden. Otherwise, the Commission fears such elaborate codes may detract from the educational character of an academic institution and may inadvertently create an adversary relationship between school officials and students. The Eighth Circuit Court of Appeals suggests "flexibility and reasonable breadth, rather than meticulous specificity" and further observes, with reference to the ability of the body to whom the rules are directed to understand them, that "the college student * * * is appropriately expected to possess some minimum intelligence. * * *" Esteban v. Central Missouri State College, supra, at 1088. The regulation herein,[6] therefore, will be read in the light of the principles enunciated above, viz., mindful of the compre-hensive authority possessed by school officials to prescribe and control conduct in the schools, the need for flexibility and reasonable breadth in the promulgation of Rules of Conduct, the educational ends sought to be accomplished in a university setting, and the intellectual competency of the student body, is Section II(A) of the University Guide so vague and overbroad on its face as to deny fundamental constitutional safeguards to the plaintiffs? I hold that it is not.

After specifying the laudable purposes underlying free and open expression, and emphasizing that it will be promoted and protected by the University, Section II(A) recognizes the right of lawful assembly and demonstration. However, while recognizing that these rights must be protected by the University, the Regulation excludes any *action* or combination of actions which *unreasonably* interferes with the *operation* of, and right of *access to*, physical accommodations used in the performance of the teaching, research, and administrative functions and related adjunct activities of the University, or infringes upon the rights of others to freely participate in its programs and services. What is unreasonable, much less unconstitutional, about a Regulation declaring physical accommodations used in the performance of teaching, research, and administrative functions out of bounds for such disruptive actions? *Whether it is speech-connected or stems solely from an aim to physically confiscate University property, when it becomes action that unreasonably interferes with the operation of certain essential functions of the University, it is not constitutionally protected and need not be tolerated.* The Regulation provides an adequate guide to the student of what is expected and what is forbidden. Even under the standard applicable to statutes generally, men of common intelligence would not *necessarily* guess

---

6. We do not consider Rules W–11 and W–15 inasmuch as President Walker's letter of June 19 bottomed his disciplinary action on the charge of "disruption of the operations of the University" as provided for in Section II(A) of the University Guide.

at its meaning and differ as to its application and a *reasonable* application of its terms would not include conduct protected by the Constitution. In Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968), plaintiffs argued, as here, that a statute prohibiting "picketing * * * in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any * * * county * * * courthouses * * *" was so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Mr. Justice Brennan, speaking for the Court, rejected this contention by holding that "(t)he terms 'obstruct' and 'unreasonably interfere' plainly require no 'guess(ing) at (their) meaning.' Appellants focus on the word 'unreasonably.' It is a widely used and well understood word and clearly so when juxtaposed with 'obstruct' and 'interfere.' We conclude that the statute clearly and precisely delineates its reach in words of common understanding." 390 U.S. at 616, 88 S.Ct. at 1338.

The occasion to infringe upon the rights of others is more available in the University community, and especially in those facilities where study, concentration and attentiveness are so much more the order of the day, than in a non-university setting. A classroom where an instructor is lecturing interested students is entitled to at least as much protection as the theatre where the shouting of "fire" is not to be countenanced. Research functions similarly involve a tranquil, non-disruptive atmosphere wherein the work at hand can be appropriately accomplished. Administrative functions are usually confined and centralized and would involve the use of only a small part of university property. In order to function properly and to provide educational opportunity and appropriate atmosphere, school administrators must protect against unreasonable interference with the operation of these vital and sensitive facilities. That is what was done here in language that provides as much of a compass as a student should need to fairly notify him of what is expected and what is not. The Regulation here, Section II(A) of the University Guide, is reasonable, non-discriminatory, and sufficiently specific and necessary to fulfill the University mission. Plaintiffs' contention that it is vague and overbroad is rejected.

## III.  DENIAL OF PROCEDURAL DUE PROCESS

▇▇▇▇  Plaintiffs also contend that the action of the Board of Trustees in appointing a Special Disciplinary Panel (Board #4), composed of outsiders having no experience whatever with the University, to serve as a fact-finding panel in derogation of the University's regular procedures, violated their rights to procedural due process. Specifically, the students charge that "(i)n this case, and in this case only, the University constituted a special panel, after the acts charged had occurred, with no university students or faculty or administrators thereon * * * a panel of non-University people, from which the most severe penalties resulted." More specifically, the students complain that the Temporary University Judicial Board (Board #2), consisting of two faculty members, one administrator and three students, was in existence both before and after the incidents of April 15, and would, in the normal course of events, hear all disciplinary charges, and the abrogation of this regularly established procedure [7] constituted a denial of that fundamental fairness which due process requires. On the other hand, Penn State asserts that "(t)he Woodside Commission was appointed in the sincere belief that the Temporary Judicial Board established by Resolution of the University Senate on August 3, 1969, * * * which was in existence at the time the

---

7. The Temporary University Judicial Board was merely a stop-gap measure while efforts were made to select an ac-

ceptable disciplinary panel. It it fair to say that it was indeed temporary since it never had a case before it.

offenses in question were committed, was not capable of conducting efficient hearings which would protect the rights of all parties concerned and accord due process to the students charged." To support this assertion, Penn State points to the extraordinary wrongs that had been committed; the possibility that over one hundred students could be charged; the need for impartiality, which could be expected from a commission whose members were not present on campus when the disturbances occurred; the desirability of special legal expertise inasmuch as it was anticipated that many students would be represented by able and trained counsel, and the concern that, from past experience with a similar tribunal (Board #1), the hearings would be exceedingly long in duration.[8] It is undisputed that the Board of Trustees had the power to revise all regulations promulgated by any University body or committee. In addition, plaintiffs make no claim of unfairness or denial of procedural due process by the Woodside Panel, but insist that the abrupt departure from the established procedure by appointing a different panel, in itself, was a breach of due process.

I hold that the appointment of this distinguished panel, consisting of highly respected and legally-trained members, for the purpose of making factual findings and disciplinary recommendations to the President did not offend plaintiffs' constitutional rights to procedural due process.

The oft-quoted case of Dixon v. Alabama State Board of Education, supra, in reviewing the area of students' rights, applied the standard that the minimum procedural requirements necessary to satisfy due process depends upon the circumstances and the interests of the parties involved. After weighing these factors, the Court concluded " * * * that due process requires notice and *some opportunity for hearing* before a student at a tax-supported college is expelled for misconduct." 294

F.2d at 158 (Emphasis supplied). Professor Wright, treating the problem on a wider scale, suggests that * * * the due process clause of the fourteenth amendment does not impose on universities any particular procedural model, whether it be derived from criminal, civil, or administrative proceedings. Instead the courts should accept any institutional procedure so long as it is reasonably calculated to be fair to the student involved and to lead to a reliable determination of the issues." Wright supra, at 1060. The Commission on Campus Government and Student Dissent of the American Bar Association analyzed this issue and recommended procedures that would facilitate a reasonable determination of the truth or falsity of the charges and provide fundamental fairness to the parties. Specifically, the Commission endorsed the following:

> "d. *Impartiality of the Trier of Fact*
> The truth or falsity of the charges of specific acts of misconduct should be determined by an impartial person or group. Fundamental fairness does not require any particular kind of tribunal or hearing committee, nor does it necessarily require that the finder of fact comes from or (in the case of a group) be composed of any particular segments of the University Community." Report of the American Bar Association, supra, at 23.

Penn State also points out that a special Ad Hoc Committee was named to hear charges of campus disruption in Goldberg v. Regents of University of California, supra; Marzette v. McPhee, 294 F. Supp. 562, 566 (W.D.Wis. 1968), and Stricklin v. Regents of the University of Wisconsin, 297 F.Supp. 416, 418 (W.D. Wis. 1969). In Stricklin, it was noted that a distinguished former member of the Supreme Court of Wisconsin was appointed as a hearing agent to make findings of fact and to report his findings and recommendations to the Board of Regents.

---

8. This concern was apparently shared by the University Senate. See Finding of Fact #26.

While I can appreciate that the students in this action would prefer having the facts determined and recommendations made by a panel of three students, two faculty members, and one administrator, I perceive no harm, in the constitutional sense, by a denial of such a preference. The fact that the Woodside Panel was appointed after the acts charged had taken place does not alter the fundamental fairness of the procedure followed. In short, plaintiffs have submitted no authority or persuasive reason for their proposition that, in the circumstances of this case, they had a constitutionally protected right to have the hearings held before the Temporary University Judicial Board (Board #2). Moreover, I am impressed by the reasons given by Penn State for the decision to appoint a special, legally-skilled panel. Consequently, considering all the relevant circumstances, the practicalities involved in dealing with and fairly resolving the unfortunate occurrences of April 14 and 15, 1970, weigh heavily in favor of the action taken by the Board of Trustees. Plaintiffs contention with regard to the appointment of the Woodside Panel is without merit.

## IV. SUBSTANTIAL EVIDENCE

The parties have agreed, and the weight of authority supports their agreement, e. g., Esteban v. Central Missouri State College, supra; Scoggin v. Lincoln University, 291 F. Supp. 161 (W.D.Mo. 1968); Jones v. State Board of Education, supra, and General Order on Judicial Standards, supra, that the appropriate standard of review of the disciplinary action taken against plaintiffs is the substantial evidence test as defined in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951):

"'(s)ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Consolidated Edison Co. [of New York] v. Labor Board, 305 U. S. 197, 229 [59 S.Ct. 206, 217, 83 L.Ed.

126]. Accordingly, it 'must do more than create a suspicion of the existence of the fact to be established. * * * it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' Labor Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660].

\* \* \* \* \* \*

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.

\* \* \* \* \* \*

"Congress has merely made it clear that a reviewing Court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

See also, Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

One matter is worthy of preliminary importance: since the disciplinary action was imposed upon the students by President Walker, it is his decision which must survive the substantial evidence test. The transcript of the hearings, the findings and recommendations of the Woodside Panel are only before this Court because President Walker relied upon them in making his decision. Also before the Court is the evidence submitted to President Walker by six students between June 19, 1970, the date of the imposition of the discipline, and June 30, 1970, the date of President Walker's final decision. That this is the proper course of action is clear from the fact that President Walker possesses the ultimate authority to discipline at Penn State.

After carefully reviewing the transcripts of the testimony before the Woodside Panel, the exhibits received into evidence, the findings and recom-

mendations of the majority members of the Panel, as well as the separate findings and recommendations of the dissenting Panel member, the additional material submitted to President Walker by six of the students after the disciplinary action was taken, and the actual decision of the President, I conclude that substantial evidence supports the following findings of the Woodside Panel which were accepted and adopted by the President Walker:

"1. *Geoffrey Sill*, a graduate student and teacher of English, entered Old Main on April 15, 1970, along with a number of other students in a mass demonstration which caused disruption of the normal activities and unreasonably interfered with the operation of the University.

Frank E. Forni, the Director of Governmental Relations in the office of Vice President for Public Affairs, has his office on the second floor of Old Main. At approximately 2:45 P. M. Sill approached Forni and ordered him to leave the building. When Forni advised Sill that he was employed by the University, his office was in the building, and he had no intention of leaving the building, Sill, who was at that time standing above Forni on the steps leading from the second to the first floor of the building, pushed Forni on the back toward the bottom of the flight of stairs—gave him a 'sudden jolt'—and said to him he had better leave the building peacefully or he would be thrown out.

Sill joined other students in yelling, 'Throw them out.' Sill also said to Gerald Russell, Assistant to the Provost whose office was also on the second floor of Old Main, 'Man this is our building, we are taking it over, you better leave or we will throw you out.'

Sill was seen afterward in Old Main until early evening.

We recommend he be *Dismissed*."

"2. *Alan C. Cunningham* on April 14, 1970, at about 2 P.M. joined a group of approximately 65 to 70 students who entered the Shields Building. He did not participate in any violence there. He was a part of the crowd that prevented the normal transaction of business, harassed the employes, blocked the doors with chairs, and prevented students with business in the building from carrying it out. There was no evidence of any personal misconduct on his part in the Shields Building; he was merely 'milling around in there.'

On April 15, 1970, Cunningham participated in the mass disruptive demonstration and occupation of Old Main. When Dr. Arthur Lewis, the distinguished Chairman of the University Senate attempted to address the group in Old Main at about 3:30 in the afternoon, Cunningham 'yelled' at him during the time he was talking and 'stood up on something and was flicking orange peels at him.' At about 5:30 in the evening he broke a pane of glass and kicked in the door leading to the suite of the President of the University, After doing so he was 'physically restrained' by other students. He refused to leave the mass demonstration in Old Main and eventually was arrested and removed from the building by the state police.

We recommend he be *dismissed*."

"5. *Scott E. Gibbs* participated in the mass disruptive demonstration and occupation of Old Main on April 15, 1970. Using a microphone, he was 'Speaking very excitedly, addressing the group, apparently saying that, "We have just taken over the computer center, we went down there and they are out and we're in and they are not going to function any more until we get an answer." ' Objection from some of the students that the computer center belonged to the students and should not be closed down met with further assurance from Gibbs that it would be closed. When certain students objected to damage to vending machines in the building he replied, 'so what.'

We recommend he be suspended for 4 terms."

"7. *Kenneth R. Cooper* was present and participated in the mass disruptive demonstration in Old Main on April 15, 1970, from 2 o'clock until the building was cleared. He led disruption by running around the balcony excitedly yelling. When the Deputy Sheriff was reading the injunction, he carried a portable public address system with the initials S.D.S. and by placing the speaker near the outlet caused a very high frequency squeal, turning the volume intolerably high. He went close to the deputy and continued the noise all the time he was reading. Cooper did not leave at 8 o'clock when ordered to do so by the police and joined with others in locking arms.

We recommend he be *dismissed.*"

"9. *Steven D. Weiss,* a graduate student, participated in the mass disruptive demonstration in Old Main on the afternoon of April 15, 1970. At approximately 3 P.M. over an S.D.S. amplification system he urged the assembled crowd to 'go into one office, break one window, take one file cabinet and burn it, if they refuse to negotiate with us.' He continued to participate in the demonstration and refused to leave the building until approximately 8 o'clock when he was arrested.

We recommend he be *dismissed.*"

"11. *Walter T. Champion, Jr., now on disciplinary probation,* and participated in the mass disruptive demonstration in Old Main on the afternoon of April 15, 1970. He was heard yelling, 'Throw the administrators out, throw the administrators from the building.' He did this at the time certain students were attempting to push two administrators down the steps. *He was on disciplinary probation.*

We recommend he be *dismissed.*"

"12. *Richard A. Parkany,* is accused of throwing a missile which struck on the roof of the bus being used by the State Police in the area of North Halls. Trooper Simmers was riding in the bus, saw a missile thrown—'a rock, or a brick or what' and heard it hit on the roof. Subsequently when Parkany was arrested and brought into the bus, Simmers identified him as the person who threw the missile.

We recommend that he be suspended for two terms."

"The following students were present in Old Main on April 15, 1970, participating with others in the disruptive mass demonstration from which they failed to depart after requests to do so as a result of which they were arrested and removed by State Police:

"27. *Miss Ellen Keyser,* who had been *on disciplinary probation.*

We recommend she be suspended for four terms."

It should be obvious from the findings of the Woodside Panel that the conduct of all plaintiffs went far beyond constitutionally protected freedom of speech and freedom of assembly and had become part of a mob action that caused destruction and disorder to University property and brought administrative facilities to a halt. Although some students conceivably may have been in the building on legitimate business and lingered temporarily as spectators, where, as here, a large group entered the administration building, disrupted and unreasonably interfered with normal activities, then it may be rationally inferred, in the absence of an acceptable explanation, that those who remained and gave the appearance of being part of the group, were, in fact, participants. While this would normally be enough to justify sanctions against them, the evidence in this case shows further acts of disruption by each. Sill threatened and physically assaulted an administrative official and urged the crowd to "throw them out." Any attempt to isolate freedom of expression from Sill's over-all conduct is impermissible, even though his words alone exceeded tolerable limits as they were "fighting words", Chaplin-

sky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and were made to a mob poised for action. Cunningham perpetrated acts of violence to University property, flicked orange peels on the Chairman of the University Senate, yelled at the Chairman while he was attempting to speak to the group, and refused to leave the building until he was arrested. Cooper was in the fore-front of those running around the balcony yelling excitedly and also placed the speaker of a portable public address system near an outlet causing a very high frequency squeal which interfered with the reading of the Court injunction by a Deputy Sheriff.[9] Furthermore, he refused to leave the building when ordered by the police and joined with others in locking arms. Champion, while certain students were attempting to push two administrators down the steps, spurred them on shouting "throw the administrators out." Keyser refused to leave the building until arrested and removed by the State Police. Although there is no evidence that Parkany was in the building at any time, he was identified as having thrown a rock or brick which struck a bus occupied by State Troopers engaged in the execution of arrest warrants. There can be no doubt that the conduct of the aforementioned constituted action that was not constitutionally protected. Weiss and Gibbs should be considered separately from the others because, except for their participation in the mass disruptive demonstrations, there is no additional evidence of physical misconduct. Weiss was observed on occasions moving about in the crowd and particularly, at 3:00 P.M., when he addressed the crowd over the public address system and urged them to break a window and burn a file cabinet if the administrators refused to negotiate. Exhorting a crowd to damage and destroy University property far exceeds the permissible bounds of free speech. Cf. Rollins v. Shannon, 292 F.Supp. 580

(E.D.Mo. 1968). Gibbs also addressed the crowd and, speaking excitedly, told them: "We have just taken over the computer center, we went down there and they are out and we're in and they are not going to function any more until we get an answer." The threat that "they are not going to function any more until we get an answer" is likewise, under the circumstances of this case, in the "fighting words" category and tends to encourage unlawful action. Chaplinsky v. New Hampshire, supra. In light of the disruption, violence and confiscation of property, this outburst by a student in an unlawfully occupied University building is particularly odious and cannot be sheltered as a form of free expression.

Finally, the determination of the punishment to be meted out should rest with University officials. Professor Wright proposes the wise principle that " * * * if the student has been found guilty of violation of a valid rule after a hearing that meets the tests of fairness and reasonableness, the punishment given him is a matter that should be left to the discretion of the university." Wright, supra, at 1081. See also, Buttny v. Smiley, 281 F.Supp. 280 (D.Colo. 1968). The punishment imposed on plaintiffs cannot be assailed as the record supports findings of shocking and condemnable behavior. Such student excesses need not, and should not, be countenanced on any University campus. Plaintiffs' complaint will be dismissed.

### CONCLUSIONS OF LAW

1. The jurisdiction of the Court and the constitutional requirements of substantive and procedural due process only apply to those plaintiffs upon whom the disciplinary penalties of dismissal and suspension were imposed by the President of Penn State.

■ 2. The constitutional doctrines of vagueness and overbreadth are appli-

---

9. The validity of the ex parte injunction issued on April 14, 1970, by the Centre County Court of Common Pleas is not a proper issue in the present action. Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

cable to University Regulations, but not with the same specificity as to criminal statutes.

3. Section II(A) of the Penn State University Guide, under which all plaintiffs were disciplined, is not unconstitutionally vague or overbroad on its face.

4. The appointment of the Special Disciplinary Panel, the Woodside Panel, by the Penn State Board of Trustees, was not a violation of procedural due process.

5. Substantial evidence exists to support the findings of the Special Disciplinary Panel which were accepted and adopted by the President of Penn State.

6. Plaintiffs are not entitled to declaratory or injunctive relief.

7. Plaintiffs' complaint is dismissed.

## APPENDIX

## RULES

Adopted by the Panel Requested by the President and Board of Trustees of the Pennsylvania State University to Hear Charges Against Students and Possibly Faculty Members Relating to Events During the Period of April 14, 1970 to April 23, 1970, Both Inclusive, and to Report its Findings and Recommendations to the President.

1. Written notice of the specific charges and of the time and place of hearing must have been given to all persons charged prior to the commencement of the hearing on the particular case which is being heard.

2. The charges must be signed by a representative of the university or by a person who saw part or all of the offense being committed and shall be in sufficient detail to set forth clearly the charges which the person has to defend against.

3. Those charged may be represented by legal counsel or other qualified adviser.

4. Testimony will be heard by one or more of the members of the panel.

5. Testimony will be stenographically recorded.

6. Witnesses shall swear or affirm to the truthfulness of their testimony.

7. Representatives of the University shall present relevant evidence in support of the charges. Those charged shall have the right to hear and to cross-examine, by themselves or representatives, the witnesses presented against them, and to present relevant evidence on their behalf subject to cross-examination by University representatives.

8. After the evidence has been presented by both sides, each party shall have an opportunity to argue orally before the panel. These arguments should not exceed 20 minutes each.

9. If the panel finds that the charges have been sustained, it will file a written report with the President of the University stating its findings and recommendations to the person charged. If the panel finds the charges have not been sustained, it will so report.

10. The hearings shall be open to the parties, their counsel and advisers and witnesses in reasonable number, and to such other persons as the panel may designate.

11. The panel will follow generally the rules of evidence, but like Pennsylvania Administrative Agencies it will not be bound by technical rules, and relevant evidence of reasonable probative value may be received. Reasonable examination and cross-examination will be permitted. Briefs and memoranda will be welcome.

12. An administrator acting for the panel will assist the parties and counsel in determining the probable order in which the cases will be called and an estimate of the time when the case will be reached.

13. The majority of the panel shall constitute a quorum but any member of the panel has the right to request that no action of the panel, other than purely

administrative, be taken unless all members thereof are present.

14. The panel will follow practices and procedures and apply the above rules in a manner that will assure fair, orderly, and expeditious hearings.