**Geoffrey SILL et al., Appellant in No. 71-1233, Plaintiffs,**

**and**

**Richard A. Parkany et al., Intervening Plaintiffs,**

**v.**

**The PENNSYLVANIA STATE UNIVERSITY et al.**

**Appeal of Alan C. CUNNINGHAM, No. 71-1234.**

**Appeal of Scott E. GIBBS, No. 71-1235.**

**Appeal of Kenneth R. COOPER, No. 71-1236.**

**Appeal of Steven D. WEISS, No. 71-1237.**

**Appeal of Walter T. CHAMPION, Jr., No. 71-1238.**

**Appeal of Diane K. LEHNIG, No. 71-1239.**

**Appeal of Richard A. PARKANY, No. 71-1240.**

**Appeal of Joseph SCHNELLER, No. 71-1241.**

**Appeal of Ellen KEYSER, No. 71-1242.**

**Nos. 71-1233 to 71-1242.**

United States Court of Appeals, Third Circuit.

Submitted Feb. 11, 1972.

Decided June 8, 1972.

Thomas K. Gilhool, Philadelphia, Pa., for appellants.

G. Thomas Miller, McNees, Wallace & Nurick, Harrisburg, Pa., Delbert J. McQuaide, Bellefonte, for appellees.

Before MARIS and MAX ROSENN, Circuit Judges, and VAN ARTSDALEN, District Judge.

## OPINION OF THE COURT

MARIS, Circuit Judge.

These are consolidated appeals by ten of the plaintiffs from an order of the District Court for the Middle District of Pennsylvania dismissing an action brought by students against The Pennsylvania State University, its board of trustees and three of its officers, in which the plaintiffs sought declaratory and injunctive relief.

The facts out of which the controversy arose are fully set out in the findings and opinion of the district court filed by Judge Nealon, 318 F.Supp. 608, and need not be detailed here. Suffice it to say that early in 1969, when the University experienced an increasing number of student disciplinary problems, its president sought to establish a disciplinary system with appropriate regulations for the adjudication of charges against students. Disciplinary boards were set up and regulations were promulgated. On April 15, 1970 the Coalition for Peace, a campus group, conducted a noon rally in front of "Old Main", the principal administration building. A march followed which did not hinder normal activities nor did the University officials interfere with it in any way. After the march, at about 1:30 o'clock P.M., several hundred students entered Old Main and remained there. The operations of the administrative offices were disrupted by the students, some of whom ran throughout the building, took down fire hoses, broke into the president's locked office, closed the Old Main computer center, broke several vending machines, and ordered the administrators out of the building, engaging in shoving and pushing two of them. The students were requested to leave the building but refused to do so.

On the previous day, April 14th, at about 2 o'clock P.M., between 60 and 75 students had entered the Shields Building, which houses various other administrative offices. There was no physical violence but the administrative functions carried on there were interfered with and ceased. At closing time the students left the building. That same day the University sought and was granted an ex parte preliminary injunction by the Court of Common Pleas of Centre County, Pennsylvania, restraining ten named students and forty others designated as "John Doe" from obstructing the free ingress to and egress from the Shields Building and any other premises or property of the University. At about 4 o'clock P.M. on the following day, April 15th, when the students were disrupting the operations of the administrative offices in Old Main, a deputy sheriff attempted to read this injunction to the crowd assembled in the center hall of the building. The noise and confusion from the crowd and interference by a high-frequency squeal from a public address system which was being used by one of the students was so great that the reading of the injunction was unintelligible to those close to the deputy and was inaudible to most of the students in the building. At about 6 o'clock P.M. the University obtained a writ of attachment for violation of the injunction; at 7:50 o'clock P.M. a member of the state police arrived at Old Main and announced that those remaining after two minutes would be arrested. Thereafter, those who remained were taken to waiting buses. In a melee which followed, about 15 policemen were injured, eight of whom required hospital treatment.

The president of the University announced on April 20th that violations of

the regulations arising out of the events of April 14th and 15th would be dealt with by the Temporary University Judicial Board. Thereafter during the evening of April 20th and continuing until the early hours of April 21st, fire bombing and window-breaking incidents at several buildings took place, including a stoning attack on the home of the president. On April 21st, when state police returned to arrest certain students, stones and other missiles were thrown at them and their buses causing injury to one officer. Several students were arrested at that time.

Two days later, on April 23, 1970, the board of trustees of the University met in special session and in a statement announced that it had asked "a distinguished group of private citizens" to serve as a fact finding panel to hear charges against certain students and to make recommendations to the president. Three distinguished members of the legal profession accepted appointment to this panel which became known as the "Special Disciplinary Panel".

Disciplinary charges were brought against thirty-six undergraduate and three graduate students. Proper notice of hearing and specifications of charges were given. All the plaintiffs were charged with violating section IIA of the University's "Guide to University Regulations Concerning Students Affairs, Conduct and Discipline, 1969–1970." Fifteen of the plaintiffs were also charged with violating Rules W-11 and W-15 of the University's "Senate Policies and Rules for Undergraduate Students, 1969–1970." The Special Disciplinary Panel adopted rules of procedure which are appended to the opinion of the district court, 318 F.Supp. 625–626, and conducted hearings on May 18, 19 and 20, 1970. Seven of the plaintiffs, including five of the appellants, Champion, Cunningham, Gibbs, Keyser and Parkany, made no appearance before the panel; ten of the plaintiffs, including five of the appellants, Sill, Cooper, Weiss, Lehnig and Schneller, ap-

peared, were represented by counsel, and at the outset attacked the legality of the panel itself to hear the charges but, when their challenge to the jurisdiction of the panel was rejected, withdrew from the proceedings and did not participate further.

After hearing the charges, the special Disciplinary Panel submitted written reports and recommendations to the president of the University, two members submitting a majority report recommending that five of the appellants, Sill, Cunningham, Cooper, Weiss and Champion, be dismissed; that two, Gibbs and Keyser, be suspended for four terms; that one, Parkany, be suspended for two terms; that one of the appellants, Lehnig, and seven other plaintiffs, be placed on probation for two years, and that one appellant, Schneller, be placed on probation until graduation. The dissenting member of the panel submitted a separate report to the president recommending disciplinary action for eight students ranging from letters of warning to suspension for one term. The president accepted the recommendations of the majority report of the panel and on June 19, 1970 informed each of the plaintiffs that the disciplinary action recommended by the majority report would be imposed, effective immediately. However, he afforded the plaintiffs an opportunity to submit statements to him by June 26, 1970. On June 30, 1970 the president informed each plaintiff that his decision of June 19th would not be altered.

On July 2, 1970 the plaintiffs brought the present suit to enjoin the disciplinary action. A motion for a temporary restraining order was denied. A motion for a preliminary injunction, made by two of the plaintiffs, was also denied. 315 F.Supp. 125. After final hearing, the district court filed its findings of fact and opinion denying the injunction. 318 F.Supp. 608. It is the judgment entered thereon dismissing the complaint from which the appeals now before us were taken.

The appellants contend here, as they did in the district court, that the regulations under which they were charged and disciplined are unconstitutionally vague and overbroad, that submission of the charges to a special disciplinary panel deprived them of due process of law, that they were disciplined without substantial supporting evidence, and that all of them, including those placed on probation, had standing in the district court to challenge the disciplinary procedure taken against them. We consider these contentions seriatim.

### I. Unconstitutional Vagueness

■■ The appellants assert that the University regulations for the violation of which they were disciplined are so vague and broad as to deny them due process of law in violation of the Fourteenth Amendment to the Constitution. It is true that a prohibitory law of a state which is so vague as to require speculation as to its meaning runs afoul of the Fourteenth Amendment and that this rule extends to rules regulating the conduct of students in educational institutions chartered or supported by the state. Soglin v. Kauffman, 7 Cir. 1969, 418 F.2d 163. See Tinker v. Des Moines, Independent Community School Dist., 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and Keyishian v. Board of Regents of New York, 1967, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629. It is also true, however, that codes of conduct prescribed for students by educational institutions are not required to satisfy the same rigorous standards in this regard as are criminal statutes. Soglin v. Kauffman, 7 Cir. 1969, 418 F.2d 163, 168. For student discipline is not analogous to criminal prosecution. Norton v. Discipline Committee of East Tenn. State Univ., 6 Cir. 1969, 419 F.2d 195, 200; Esteban v. Central Missouri State College, 8 Cir. 1969, 415 F.2d 1077, 1088.

■ Here the appellants attack as unconstitutionally vague Section IIA of the Guide to University Regulations Concerning Student Affairs, Conduct and Discipline, 1969–1970, as well as Rules W–11 and W–15 of the Senate Policies and Rules for Undergraduate Students, 1969–1970.[1] However, the district court did not consider the alleged infirmity of Rules W–11 and W–15, nor do we, since it is clear that the president of the University rested his disciplinary action on the charge of "disruption of the operations of the University" as proscribed by Section IIA of the Guide. Accordingly, we turn to the consideration of that section, which reads in whole as follows:

> "II. STUDENT STANDARDS—
> INDIVIDUAL BEHAVIOR
> AND CONDUCT
>
> . . .
>
> A. STATEMENT ON OPEN EXPRESSION AND DISRUPTION
>
> 1. As an academic community consisting of students, faculty, administration, and a board of trustees, the Pennsylvania State University is committed to the protection and preservation of the free search for truth; the

---

1. "W–11. The University regards as serious offenses all acts of unethical, immoral, dishonest, or destructive behavior, as well as violations of University regulations as set forth by the *Student Handbook* and the *Senate Policies and Rules for Undergraduate Students.* Any charges under this rule must cite a specific alleged offense or offenses. No student shall be subject to discipline solely under a general charge of unethical, immoral, dishonest, or destructive behavior.

Students who are found guilty of having committed an offense under paragraph 1 of this rule may be subject to disciplinary action. The right to dismiss a student is reserved to the President of the University.

"W–15. Details of Senate regulations for undergraduate students shall be embodied in a *Guide to University Regulations Concerning Student Affairs, Conduct, and Discipline* which shall be given to each student entering the University. Procedural details contained in this guide may differ among the several campuses."

freedom of thought, inquiry, and speech; and the freedom to hear, examine, and debate alternative theories, data, and views. These are fundamental rights which must be practiced, protected, and promoted by this university.

2. It is essential in the University that channels of communication be open, effective, and accessible to all members of the academic community.

3. Acknowledging that the process of communication may include various forms of individual and collective expression, the University recognizes the right of lawful assembly and demonstration. However, a university dedicated to free inquiry and discussion cannot sanction any inferference with or destruction of its responsibilities. The regular and essential operation of the University is construed to include, but is not limited to, the operation of its offices, classrooms, laboratories, research facilities, and the right of access to these and any other physical accommodations used in the performance of the teaching, research, and administrative functions and related adjunct activities of the University.

4. Disruption is an action or combination of actions by an individual or a group which unreasonably interferes with, hinders, obstructs, or prevents the regular and essential operation of the University or infringes upon the rights of others to freely participate in its programs and services.

5. It is the responsibility of University officials to initiate action to restrain or prohibit behavior which threatens the purposes or the property of the University or the rights, freedoms, privileges, and safety of the personnel of the academic community."

The appellants say that the regulation fails to meet the standard of specificity in that the students were not provided with a reasonably clear and specific description of the misconduct which is to be subject to discipline. They argue that the district court was wrong in finding that the regulation provided an adequate guide to the student of what is expected and what is forbidden. We cannot agree. On the contrary, we think that it spells out quite clearly and in sufficient detail the conduct which is forbidden. For it specifically prohibits, inter alia, disruption "by an individual or a group which unreasonably interferes with . . . the operation of its offices, classrooms, laboratories, research facilities, and the right of access to these and any other physical accommodations used in the performance of the teaching, research, and administrative functions and related adjunct activities of the University." Adopting the apt language of Judge (now Justice) Blackmun, speaking for the court in Esteban v. Central Missouri State College, 8 Cir. 1969, 415 F.2d 1077, 1088,

" . . . we do not find the regulation at all difficult to understand and we are positive the college student, who is appropriately expected to possess some minimum intelligence, would not find it difficult. It asks for the adherence to standards of conduct which befit a student and it warns of the danger of mass involvement. We must assume Esteban and Roberds can read and that they possess some power of comprehension. Their difficulty was that they chose not to read or not to comprehend."

We do not have here a situation in which punishment was imposed on students simply on the basis of allegations of misconduct without reference to any preexisting rule which supplied an adequate guide. On this ground Soglin v. Kauffman, D.C.Wis.1968, 295 F.Supp. 978, aff. 7 Cir. 1969, 418 F.2d 163, upon which the appellants rely, is distinguishable on its facts. And the mere fact that free speech is intermingled with the conduct for which the appellants were punished does not bring it within constitutional protection. Cameron v. Johnson, 1968, 390 U.S. 611, 617, 88 S.Ct. 1335, 20 L.Ed.2d 182. Here, on the contrary, the regulation was sufficiently

specific and, moreover, was reasonably directed to the end to be attained. See Esteban v. Central Missouri State College, 8 Cir. 1969, 415 F.2d 1077; Sword v. Fox, 4 Cir. 1971, 446 F.2d 1091, 1098, and Dickey v. Alabama State Board of Education, D.C.Ala.1967, 273 F.Supp. 613, 617–618. The appellants also contend that the regulation was overbroad. We have considered this contention but find no basis whatever for holding that it is so broad as to encroach upon any constitutionally protected speech or action.

We conclude that the appellants' attack on the constitutionality of the regulation under which they were disciplined is without merit.

## II. Deprivation of Procedural Due Process

The appellants contend that submission of the charges against them to the special disciplinary panel deprived them of procedural due process of law. They say that the faculty-administrator-student judicial boards which had been set up during 1969 should have determined the charges against them and that departure from the regularly established disciplinary procedure by the board of trustees in placing the charges against them before a panel of outsiders having no experience with the University violated their rights to procedural due process of law.

 It is well settled that there is no constitutional right to be heard by a particular tribunal. In this regard the Supreme Court, in Crane v. Hahlo, 1922, 258 U.S. 142, 147, 42 S.Ct. 214, 216, 66 L.Ed. 514, said:

"In determining whether or not due process of law has been denied, regard must always be had to the character of the proceeding involved . . .

. . . . . .

"No one has a vested right in any given mode of procedure . . . and so long as a substantial and efficient remedy remains or is provided due process of law is not denied by a legislative change."

Nor is the procedure required to afford due process of law of a fixed and invariable character; the requirements of due process frequently vary with the type of proceeding involved. Federal Communications Commission v. WJR, The Goodwill Station, Inc., 1949, 337 U.S. 265, 274–275, 69 S.Ct. 1097, 93 L.Ed. 1353; Hannah v. Larche, 1960, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307. The basic elements are notice and the opportunity to be heard by a fair and impartial tribunal legally constituted and having jurisdiction of the cause. Powell v. Alabama, 1932, 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed. 158; United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 202, 76 S.Ct. 763, 100 L. Ed. 1081; Dixon v. Alabama State Board of Education, 5 Cir. 1961, 294 F. 2d 150; Esteban v. Central Missouri State College, 8 Cir. 1969, 415 F.2d 1077, 1089. That the appellants had adequate notice and the opportunity to be heard is clear from the record. Our inquiry in this regard, therefore, is limited to the question whether the appointment of the special disciplinary panel by the board of trustees and the submission to it of the charges against the appellants was a violation of the appellants' right to procedural due process.

The appointment of the panel was unquestionably valid on its face and its action bears a like mark of validity. Due v. Florida A. and M. University, D.C. Fla.1963, 233 F.Supp. 396, 402–403. The management and government of the Pennsylvania State University has been committed by law to its board of trustees. Act of February 22, 1855, P.L. 46, § 2, 24 P.S. (Pa.) § 2532. It is clear that under the statute the board had the power to create the special disciplinary panel. The creation of the panel was subsequently approved by the University Senate as affording the best possibility for a fair, impartial and expeditious handling of the charges. In Soglin v. Kauffman, D.C.Wis.1968, 295 F.Supp. 978, 989, the court observed: "I see no

constitutional bar to an arrangement by which the state vests in a board of regents and the faculty the power to govern a university and to discipline its students; nor do I see any constitutional bar to a prompt and severe disciplinary response to violence and rioting and other constitutionally unprotected conduct."

■ The appellants say that the special disciplinary panel did not actually reach a determination in less time than it would have taken one of the University's regular boards but that there were other reasons why the board of trustees established the panel. However, we are not here concerned with the motives which prompted the creation of the board or the selection of its membership, whose fairness and impartiality is not contested, but rather with whether the board of trustees exercised its power reasonably and did not abuse its discretion. Blackwell v. Issaquena County Board of Education, 5 Cir. 1966, 363 F. 2d 749, 754; Barker v. Hardway, D.C. W.Va.1968, 283 F.Supp. 228, 235, aff. 4 Cir. 1968, 399 F.2d 638. We fully agree with the conclusion of the district court that the appointment of the special disciplinary panel for the purpose of making factual findings and disciplinary recommendations to the president was a reasonable exercise of the power vested in the board of trustees and did not offend the appellants' constitutional rights to procedural due process.

### III. Sufficiency of the Evidence

■ The appellants contend that there was not substantial evidence to support the severe discipline imposed upon some of them and that the district court did no more than adopt verbatim the findings of the majority of the special disciplinary panel. They say that the charges made against nearly all the appellants that they participated in a mass demonstration in Old Main, physically blocking the second floor balcony and the steps leading there, which conduct caused disruption of the normal ac-

tivities of the building, and that they failed to leave despite personnel requests to depart, were not proved with respect to any one of them. They assert that there was an improper commingling of testimony of a general nature about the demonstration and testimony regarding specific charges against individual appellants which were not adequately proved.

The district court, after carefully reviewing the transcript of the testimony before the panel, the exhibits received into evidence, the findings and recommendations of the majority panel members, as well as that of the dissenting panel member, and the additional material submitted to the president by some of the students after the disciplinary action was taken, concluded that substantial evidence supported the findings of the majority of the panel which were accepted and adopted by the president. In doing so the district court properly performed its function. It was not for that court, as it is not for us, to retry de novo the charges against the appellants. Upon our review of the record we are satisfied that the district court did not err in its conclusion.

### IV. Standing To Sue of Students Placed On Probation

■ Two of the appellants, Lehnig and Schneller, were disciplined by the imposition of probation for two years and until graduation, respectively; there was no interruption in their activities as students. The district court held that they and the seven other plaintiffs placed on probation had not been aggrieved in the constitutional sense so as to have standing to challenge the regulations here involved and that the punishment imposed upon them, being placed on probation and being denied certain school privileges, did not rise to the level of the deprivation of a right secured by the Constitution requiring judicial relief. These two appellants say that even though the present penalties are mild they may ultimately, on another occasion, be in jeopardy of major sanc-

tions because of them, and that the district court, therefore, erred in holding that only the suspended or expelled students could maintain the present action. We cannot agree that the possibility that a future sanction will be made more severe because of these infractions of discipline creates in the students on probation an aggrievement analogous to that suffered by those students who were deprived of continued attendance at the University.

We find no error in the conclusion of the district court that the students who were placed on probation did not have standing to maintain the present action.

The judgment of the district court dismissing the complaint will be affirmed.