FILED

06/23/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0825

DA 25-0825

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 131

JORDAN WILLIAMS,

      Plaintiff and Appellee,

   v.

GREG GIANFORTE, in his official capacity as the
GOVERNOR OF THE STATE OF MONTANA;
MARTA BERTOGLIO, in her official capacity as
the APPOINTED DIRECTOR OF THE DEPARTMENT
OF COMMERCE; and MISTY ANN GILES, in her
official capacity as DIRECTOR OF THE MONTANA
DEPARTMENT OF ADMINISTRATION,

      Defendants and Appellants.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. BDV-25-466 Honorable Elizabeth A. Best, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

            Dale Schowengerdt, Landmark Law PLLC, Helena, Montana

      For Appellee:

            Rylee Sommers-Flanagan, Molly E. Danahy, Andres Haladay, Upper Seven Law, Helena, Montana

                    Submitted on Briefs:  May 20, 2026

                              Decided:  June 23, 2026

Filed:

                    _____
                              Clerk

Justice Katherine M. Bidegaray delivered the Opinion of the Court.

¶1 Greg Gianforte, in his official capacity as the Governor of Montana; Marta Bertoglio, in her official capacity as the Appointed Director of the Department of Commerce; and Misty Ann Giles, in her official capacity as Director of the Montana Department of Administration (collectively, the Governor), appeal the Montana First Judicial District Court's November 2025 denial of the Governor's motion to return the case to Judge Kathy Seeley for reassignment pursuant to Senate Bill 41 (SB 41).

¶2 We address the following restated issue:

*Whether the District Court erred when it applied this Court's existing judicial substitution rule, rather than Senate Bill 41 or the August 28, 2025 memorandum, after all First Judicial District judges had been substituted or had declined jurisdiction.*

¶3 We hold the District Court correctly refused to return the case for reassignment because this Court had not amended, superseded, or replaced its existing substitution rule, codified as § 3-1-804, MCA, when Judge Seeley invited Judge Best to assume jurisdiction. Article VII, Section 2, of the Montana Constitution confirms this Court's supervisory and procedural rulemaking authority over the courts. Neither SB 41 nor the August 28, 2025 memorandum operated as an amendment to this Court's existing rule. The District Court therefore correctly applied the existing substitution procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Jordan Williams filed this action in the First Judicial District Court, Lewis and Clark County, on August 6, 2025. The complaint named the State of Montana, Governor Greg Gianforte, Commerce Director Marta Bertoglio, Attorney General Austin Knudsen, and

2

Department of Administration Director Misty Ann Giles as defendants. Williams alleged that Governor Gianforte's June 2025 appointment of then-Representative Bertoglio as Director of the Montana Department of Commerce violated Article V, Section 9, of the Montana Constitution because Bertoglio was appointed to a civil office under the State during the legislative term for which she had been elected.

¶5 This appeal does not concern the merits of the Article V, Section 9 challenge. It concerns only whether Judge Elizabeth Best properly assumed jurisdiction after all First Judicial District judges had been substituted or declined jurisdiction, and specifically whether the District Court erred by refusing to return the case to Judge Kathy Seeley for a randomized assignment pursuant to SB 41. The Governor characterizes the issue as whether the District Court erred in making and later affirming a non-random post-substitution assignment after SB 41's effective date. Williams frames the issue as whether the District Court properly followed existing judicial substitution procedures in the absence of this Court having established a final random-selection procedure under SB 41.

¶6 Williams filed his complaint on August 6, 2025, and Judge Seeley was assigned the case. On August 27, the State and Attorney General moved to substitute Judge Seeley. Judge Menahan declined jurisdiction, and Judge McMahon assumed jurisdiction on September 2. On September 23, the Governor moved to substitute Judge McMahon. Judge Abbott then assumed jurisdiction on September 26. On October 1, Williams moved to substitute Judge Abbott pursuant to § 3-1-804, MCA, and paid the required filing fee. By

3

that point, all First Judicial District judges had either been substituted or declined jurisdiction.

¶7 On October 6, 2025, Judge Seeley invited Judge Best of the Eighth Judicial District, Cascade County, to assume jurisdiction. Judge Best accepted jurisdiction on October 17. On November 10, the Governor moved to return the case to Judge Seeley for assignment under SB 41 or, alternatively, for clarification that Judge Seeley had selected Judge Best at random. On November 12, Judge Best denied the motion. The District Court reasoned that, although Defendants argued SB 41 and the August 28, 2025 memorandum from Chief Justice Swanson and Court Administrator McAlpin controlled, "the Montana Supreme Court has not yet adopted a new process for substitution"; the court therefore concluded Judge Seeley properly applied § 3-1-804, MCA, and Judge Best properly accepted jurisdiction. The Governor filed an amended notice of appeal on December 2, 2025.

¶8 After the appeal was filed, the District Court ordered supplemental briefing on whether the interlocutory appeal divested it of jurisdiction to resolve the parties' fully briefed cross-motions for summary judgment. Williams later filed a notice of indicative ruling and opposed motion to remand, asserting that the District Court had granted Williams's summary judgment motion and denied Defendants' cross-motion, and requesting remand for entry of judgment so that the jurisdictional and merits issues could be consolidated in a single appeal. The Governor opposed remand, arguing that the substitution issue is a threshold jurisdictional question and that, if the assignment to Judge Best was improper, all later orders would be void.

¶9 In 2025, the Legislature enacted SB 41. As described by the Governor, the bill was prompted by concern that, after substitution, recusal, or disqualification, judges sometimes selected replacement judges non-randomly, creating concern that a substituted judge could "hand-pick" a replacement. SB 41 provides that, when calling in subsequent district judges, a judge who has been substituted, disqualified for cause, or recused "shall follow the procedure for the random selection of subsequent district judges as established by the office of the court administrator." The bill defines "random selection" as "a selection from a larger group by chance" and requires a mechanism ensuring that the subsequent judge's district is reasonably geographically close to the original judge's district while still remaining random. SB 41 directed the Office of Court Administrator (OCA) to establish a procedure by October 1, 2025, and to provide that procedure to all district court judges by October 15, 2025. Section 1 of the bill became effective October 1, 2025.

¶10 On August 11, 2025, Chief Justice Swanson and Court Administrator McAlpin circulated a memorandum to district court judges soliciting comments on a draft rule to implement SB 41. The August 11 memorandum stated that SB 41 required the OCA to create a procedure for random assignment and that the procedure "must be established not later than October 1, 2025." It proposed an implementation timeline culminating in an October 1 launch.

¶11 On August 28, 2025, Chief Justice Swanson and Court Administrator McAlpin circulated an updated memorandum after receiving feedback from district court judges. The Governor asserts that the August 28 memorandum set forth an actionable procedure, including regional pools. For the First Judicial District, the Governor represents that the

5

regional pool consisted of judges from the 3rd, 5th, 8th, 9th, 11th, 14th, and 18th Judicial Districts. Williams characterizes the August 28 memorandum differently—as an updated proposed procedure still subject to comment and not formally adopted by this Court.

¶12 On September 12, 2025, this Court issued an order in AF 09-0289 seeking public comment on the proposed procedure. The order stated that OCA had "designed and recommended a randomized procedure" and that the Court invited comment from the District Court Council, the bar, the judiciary, and the public. *In re Rules on Disqualification and Substitution of Judges*, No. AF 09-0289, Order (Sept. 12, 2025). Williams relies heavily on the September 12 order's use of "recommended" and "proposed" language to argue that no procedure had yet been "established" within the meaning of SB 41. The Governor responds that SB 41 required a procedure, not a formal rule, and that the August 28 memorandum constituted the procedure "as established" by OCA by the October 1 effective date.

¶13 On September 26, 2025, according to Williams, the Chief Justice publicly acknowledged during a Continuing Legal Education presentation that the Court would miss SB 41's October 1 deadline because it needed public comment to get the rule right. Williams also cites the November 18, 2025 public meeting minutes, asserting that this Court did not adopt amendments at that meeting and instead unanimously postponed action on the proposal. The Governor does not dispute that this Court had not formally adopted a new rule by October 1; instead, the Governor argues formal adoption was not required because SB 41 refers to a "procedure" established by OCA, not a "rule" adopted by this Court.

6

¶14     Against that backdrop, Williams moved to substitute Judge Abbott on October 1, 2025.  Judge Seeley invited Judge Best to assume jurisdiction on October 6.  Judge Best accepted jurisdiction on October 17.  The record does not affirmatively state that Judge Best was selected randomly, nor does it affirmatively state that Judge Best was selected non-randomly.  Williams emphasizes that the Governor failed to prove the selection was not random.  The Governor responds that its motion expressly asked the District Court to clarify whether Judge Best had been randomly selected, and the District Court denied the motion without saying that the selection had been random.

¶15     On November 12, 2025, the District Court denied the Governor's motion to return the case to Judge Seeley.  The District Court's order treated § 3-1-804, MCA, as the operative procedure because this Court had not yet adopted a new substitution process.  The Governor appeals from that order and from the order by which Judge Best assumed jurisdiction, under M. R. App. P. 6(3)(k).  The narrow question is therefore whether the District Court correctly applied existing substitution law or instead was required, after October 1, 2025, to implement SB 41 by applying the August 28 memorandum or by making some independent effort at random selection.

**STANDARD OF REVIEW**

¶16     This appeal presents a legal question concerning the proper application of Montana's judicial substitution procedures and the legal effect, if any, of SB 41 on a post-substitution assignment made after October 1, 2025.  A district court's ruling on judicial substitution, including its interpretation and application of judicial substitution statutes, presents a question of law reviewed de novo for correctness.  *Holms v. Bretz*,

7

2021 MT 200, ¶ 4, 405 Mont. 186, 492 P.3d 1210; *City of Missoula v. Mountain Water Co.*, 2021 MT 122, ¶ 8, 404 Mont. 186, 487 P.3d 15; *Sweeney v. Dayton*, 2018 MT 95, ¶ 6, 391 Mont. 224, 416 P.3d 187. To the extent this appeal requires statutory interpretation, the Court begins with the statutory text and implements the Legislature's objective if that intent can be determined from its plain language. *State v. Bloomer*, 2025 MT 93, ¶ 9, 421 Mont. 481, 568 P.3d 513; *Montana Ass'n of Counties v. State*, 2023 MT 225, ¶ 10, 414 Mont. 128, 538 P.3d 1136.

## DISCUSSION

¶17 *Whether the District Court erred when it applied this Court's existing judicial substitution rule, rather than Senate Bill 41 or the August 28, 2025 memorandum, after all First Judicial District judges had been substituted or had declined jurisdiction.*

**A. The District Court's order was correct.**

¶18 The Governor argues that the District Court erred by denying the motion to return the case to Judge Seeley for random reassignment because SB 41 controlled. SB 41 directed the Office of the Court Administrator to establish a procedure for randomized judicial substitutions before October 1, 2025, and to provide that procedure to all district court judges by October 15, 2025. 2025 Mont. Laws ch. 353, § 1. Williams contends the District Court correctly followed this Court's substitution procedure because it had not promulgated a new rule when the substitution occurred. We agree that the District Court correctly applied the existing substitution rule. We resolve this appeal on narrow grounds. The Montana Constitution vests this Court with "general supervisory control over all other courts" and authority to "make rules governing appellate procedure, practice and procedure

8

for all other courts." Mont. Const. art. VII, § 2(2), (3). Section 3-1-804, MCA, is "a codified Rule adopted by the Montana Supreme Court." *Holms*, ¶ 8. Whatever valid policy concerns SB 41 reflects, neither SB 41 nor the August 28 memorandum amended, superseded, or replaced this Court's existing substitution rule. Because this Court had not promulgated any amendment to that rule when Judge Seeley invited Judge Best to assume jurisdiction, the District Court correctly applied the existing rule.

**Existing Substitution Rule**

¶19    Section 3-1-804, MCA, governs the process for judicial substitution in Montana. That section is "a codified rule adopted by the Montana Supreme Court," not an enacted statute. *Holms,* ¶ 8. This Court is charged with adopting and amending the rules governing appellate procedure, practice and procedure for all other Montana courts, and lower courts are obligated to follow this Court's rules.[1] *See* Mont. Const. art. VII, § 2; § 3-2-706, MCA.

¶20    This Court's rule governing substitution is No. AF 09-0289. *In re Revised Rules on Substitution of District Judges*, No. AF 09-0289, Order (Mont. Mar. 24, 2015) (2015 Substitution Rule). The Substitution Rule applies to all district court judges. Under the Substitution Rule, each adverse party has one substitution of right. 2015 Substitution Rule, § 1. To properly exercise this entitlement, the party seeking substitution must file the motion within 30 calendar days of service. 2015 Substitution Rule, § 3. The motion

---

[1] This Court's prior amendments to the substitution rule illustrate the point. In 2009 and 2015, the Court amended the rule through Court action after notice and consideration of comments, and the amendments became effective by order of this Court. *See In re Revised Rules on Substitution of District Judges*, No. AF 09-0289, Order (Mont. Mar. 24, 2015); *In re Rules for Disqualification and Substitution of Judges*, No. AF 09-0289, Order (Mont. July 9, 2009). We cite that history only to confirm that the August 28 memorandum did not itself amend the existing rule.

becomes effective after that party pays the required filing fee to the clerk of the district court. 2015 Substitution Rule, § 3. Once the motion is effective, the first substituted judge has the duty of calling in all subsequent judges. 2015 Substitution Rule, § 6. If that judge is in a multijudge district, "all other district judges in that district must be called before a district judge from another district is called." 2015 Substitution Rule, § 6.

**Senate Bill 41 and the August 28 memorandum did not displace the existing substitution rule**

¶21 The Governor's strongest argument is textual. SB 41 provides that, "[w]hen calling in subsequent district judges, a judge who has been substituted, disqualified for cause, or recused shall follow the procedure for the random selection of subsequent district judges as established by the office of the court administrator." SB 41 also directed OCA to establish a procedure by October 1, 2025, and to provide it to district court judges by October 15, 2025. The Governor argues that this language required Judge Seeley, beginning October 1, to follow whatever procedure OCA had established by that date, even though this Court had not amended its substitution rule. The Governor further argues that the August 28 memorandum supplied an actionable procedure because it identified regional pools, including the First Judicial District's regional pool.

¶22 The Governor's argument fails because it assumes SB 41 or a memorandum from the Chief Justice and OCA could displace this Court's existing substitution rule without action by this Court. "Section 3-1-804, MCA, is a codified rule adopted by the Montana Supreme Court." *Holms*, ¶ 8. The Montana Constitution vests this Court with general supervisory control over all other courts and authority to make rules governing practice

10

and procedure for those courts. Mont. Const. art. VII, § 2(2), (3). Existing laws and rules relating to pleading, practice, and procedure remain effective as rules of court until modified or superseded. Section 3-2-706, MCA. The Governor identifies no order or rule by which this Court amended, superseded, or replaced the 2015 Substitution Rule before Judge Seeley invited Judge Best to assume jurisdiction.

¶23 We do not decide the full scope of the Legislature's authority concerning SB 41, the full scope of OCA's administrative authority, or any constitutional challenge to SB 41. The narrower point resolves this appeal: whatever valid policy concerns SB 41 reflects, neither SB 41 nor the August 28 memorandum amended, superseded, or replaced this Court's existing substitution rule. The District Court therefore did not err by applying the rule that governed judicial substitution when Judge Seeley acted. The District Court did not declare SB 41 invalid or purport to resolve the constitutional boundaries between the Legislature, OCA, and this Court. It concluded that this Court had not adopted a new substitution process and that Judge Seeley therefore properly applied § 3-1-804, MCA. That conclusion was correct.

¶24 The Governor's record-based argument about randomness does not change the result. The Governor asked the District Court either to return the case to Judge Seeley for random assignment or to clarify that Judge Best had been selected randomly. The District Court did not make that clarification. But the dispositive question is not whether the record proves random or non-random selection. The dispositive question is whether Judge Seeley was required to apply SB 41 or the August 28 memorandum instead of this Court's existing

substitution rule. Because neither SB 41 nor the August 28 memorandum displaced the existing rule, the absence of a finding of randomness does not establish reversible error.

¶25 This conclusion is narrow. We do not decide whether this Court should amend its substitution rule, whether random selection would be preferable as a matter of judicial administration, whether SB 41 may have some valid future operation, or what remedy would apply if a district court failed to follow a substitution rule promulgated by this Court. We hold only that, when Judge Seeley invited Judge Best to assume jurisdiction, this Court had not amended the existing substitution rule, and Judge Seeley properly applied that rule.

¶26 The facts of this case show compliance with the existing substitution rule. All First Judicial District judges were unavailable after the parties substituted Judge Seeley, Judge McMahon, and Judge Abbott; and Judge Menahan declined jurisdiction. Judge Seeley then invited Judge Best from the Eighth Judicial District to assume jurisdiction, and Judge Best accepted. The Governor does not show that this sequence violated the 2015 Substitution Rule. Because this Court had not amended, superseded, or replaced that rule, Judge Seeley and Judge Best properly followed the rule in effect.

¶27 The controlling precedents concerning substitution also support treating this appeal as a threshold issue, but they do not compel reversal. In *City of Missoula*, this Court held that once a timely substitution motion is filed, the substituted judge lacks power to act on the merits or decide legal issues in the case. *City of Missoula*, ¶ 12. In *Holms*, this Court held that, when a substitution is improper, later orders by the substitute judge may be void. *Holms*, ¶¶ 11-13. Those cases justify immediate appellate review because judicial substitution errors may affect a judge's authority to act. But they involved whether a judge

12

had authority under the substitution rule itself. They do not answer whether SB 41 or the August 28 memorandum displaced this Court's existing substitution rule. The cases therefore support deciding the issue promptly, but they do not establish that Judge Best's assumption of jurisdiction was unlawful or that her refusal to return the case to Judge Seeley for reassignment was incorrect.

¶28 The Governor's reliance on ordinary statutory-interpretation cases likewise does not establish reversible error. *Bloomer*, ¶ 9; *In re Estate of Kemmer*, 2023 MT 234, ¶ 10, 414 Mont. 182, 539 P.3d 636; and *Montana Ass'n of Counties*, ¶ 10, require courts to implement legislative objectives according to statutory text and not insert omitted language. Those principles apply, but the operative question here is whether SB 41 or the August 28 memorandum displaced this Court's existing substitution rule. They did not. Likewise, *Driscoll v. Stapleton*, 2020 MT 247, ¶¶ 26-27, 401 Mont. 405, 473 P.3d 386, is distinguishable. *Driscoll* involved a district court altering a statutory deadline. Here, the District Court did not alter SB 41's deadline; it applied the existing substitution rule because this Court had not amended, superseded, or replaced that rule.

## CONCLUSION

¶29 The District Court correctly followed this Court's existing substitution rule when it denied the Governor's motion to return the case to Judge Seeley pursuant to SB 41. On October 6, when Judge Seeley invited Judge Best to assume jurisdiction, this Court had not amended, superseded, or replaced its existing substitution rule. The rule codified as § 3-1-804, MCA, remained controlling. We therefore affirm the District Court's order.

¶30 Affirmed.

13

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON

Chief Justice Cory J. Swanson recused himself and did not participate in this matter.

Justice Laurie McKinnon, concurring.

¶31 The Montana Constitution creates three separate coordinate branches of government; no branch is subordinate to the other; no branch may arrogate to itself control of the other except as is provided by the Constitution; and no branch may exercise the power committed by the Constitution to another. There are, nonetheless, amorphous "twilight zones" between the branches which make it difficult to ascertain where the functions of one branch of government begins and another ends. It is neither possible nor practicable to classify accurately all the various governmental powers and say that this power belongs exclusively to one branch and that another power belongs exclusively to the other branch. The doctrine of separation of powers does not demand a strict, complete, absolute, or scientific division of functions between the three branches; rather, the doctrine envisions a government of separated branches sharing certain powers.

¶32 The Legislature, in its obedience to promote the public interest, may enact laws to assure litigants they will realize their constitutional right to a fair trial. A biased judge

14

presents the greatest threat to a democracy because the "primary function of political society is to serve as an impartial judge over all disputes of rights that arise between its members."[1]   Hence, legislatures may enact statutes to provide the means for assuring litigants both of the actuality and the appearance of a fair trial.  Because judicial power, in the end, rests upon citizens' respect for the judgments that courts issue, "[j]udicial integrity is, in consequence, a state interest of the highest order" and a subject upon which both the legislature and judiciary are empowered to address.  *Republican Party of Minn. v. White*, 536 U.S. 765, 793, 122 S. Ct. 2528, 2544 (2002) (Kennedy, J., concurring).

¶33    Thus, undisputedly, the Legislature may make policy decisions to effectuate Montana citizens' right to a fair trial.  However, it is unclear how "random" selection of a judge advances the right to a fair trial.  The right to a fair trial does not include that the judge be selected randomly.  "[T]he law will not suppose the possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea."[2]   Indeed, short of substituting a judge, most litigants must accept the duly elected judge within their jurisdiction.  Addressing the competing principles of a fair trial and the presumption justice will be administered impartially, disqualification for cause statutes recognize that a litigant ought to be heard on a claim that a fair and unbiased tribunal is unobtainable before the particular presiding

---

[1] Kiyoshi Shimikawa, *Locke's Concept of Justice*, in Peter R. Anstey *The Philosophy of John Locke: New Perspectives* 61, 67 (2003).

[2] *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S. Ct. 1580, 1584-85 (1986) (citing 3 William Blackstone, *Commentaries* *361).

judge. Accordingly, every jurisdiction in the United States has a statutory basis upon which a litigant may seek removal of a judge who is demonstrably biased and partial; that is, removed for cause. A disqualification challenge is rooted in principals of due process intended to ensure that no person is deprived of life, liberty, or property without a fair opportunity to contest the validity of the deprivation.[3] Basic elements of due process require the litigant be heard by a judge and jury that are unbiased and impartial, in addition to being legally constituted and having jurisdiction over the cause. These protections are designed to ensure that a judgment is accurate and to eliminate the possibility of erroneous fact finding. A biased judge or jury presents the greatest threat to these principals. Disqualification or cause challenges therefore allow a litigant to substantively raise the issue of a judge's impartiality to ensure accurate decisions and compliance with basic principles of due process.[4] Accordingly, every litigant already may move to disqualify a judge on the basis that the judge is biased and that the litigant will not receive a fair trial. The random selection of the new judge, who also has taken an oath to be fair and impartial, does nothing to advance the fairness of the trial. And if the new judge is demonstrably biased, the litigant may pursue a second, third, or any number of disqualification requests. So how does "randomness" advance the interests of a fair trial? Our justice system depends

---

[3] *See Carey v. Piphus*, 435 U.S. 247, 259-60, 98 S. Ct. 1042, 1050 (1978); *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S. Ct. 780, 786 (1971); *Sill v. Pa. State Univ.*, 462 F.2d 463, 469 (3d Cir. 1972); *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979); *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 13, 99 S. Ct. 2100, 2106 (1979).

[4] *See* Raymond J. McKoski, *Disqualifying Judges When Their Impartiality Might Be Questioned: Moving Beyond a Failed Standard*, 56 Ariz. L. Rev. 411, 468 (2014).

upon the idea that judges will administer justice impartially; but it also provides that if they do not, they are subject to disqualification.

¶34 It is well established that judicial power extends beyond the power to adjudicate a particular controversy and encompasses, not only express power, but inherent, implied, and incidental powers. This includes the power to regulate matters related to adjudication. Regulation of the manner judges are selected upon substitution or disqualification falls within the vast stretch of the "twilight zone" in which the two branches, namely the judicial and the legislative, overlap. Both the judiciary and legislature are empowered to ensure not only that the fairness and integrity of the courts be maintained but also that the operation of the courts is conducted in such a manner as to avoid even the suspicion of unfairness.

¶35 Article VII of the Montana Constitution expressly vests "[t]he judicial power of the state in one supreme court, district courts, justice courts, and such other courts as may be provided by law." Mont. Const. art VII, § 1. Further, the Supreme Court "may make rules governing appellate procedure, practice and procedure for all other courts . . . [which are] . . . subject to disapproval by the legislature in either of the two sessions following promulgation." Mont. Const. art VII, § 2(3). There can be little question that SB 41 seeks to regulate the process for selecting a judge following substitution or disqualification, which would appear to be a power committed to the rulemaking function of the Supreme Court and expressly provided for in the Constitution. The rationale for granting the superintending and administrative authority in the judiciary has been described as:

> The right to control its order of business and to so conduct the same that the rights of all litigants may properly be safeguarded has always been recognized as inherent in courts, and to strip them of that authority would

17

necessarily render them so impotent and useless as to leave little excuse for their existence and place in the hands of the legislative branch of the state, power and control never contemplated by the Constitution.

*Atchison, Topeka and Santa Fe Ry. Co. v. Long*, 251 P. 486, 489 (Okla. 1926). The administration of our courts is a function of government that is primarily the concern and responsibility of the judicial branch. In our democracy, the judicial branch fulfills the function of ensuring both an efficient and fair judicial system and is itself the branch most capable of evaluating and promulgating rules and procedures which will result in a fair and efficient court system. A statute dictating how a judge is selected following substitution or recusal will have a substantial impact on the effective and efficient administration of the courts. I believe that the Legislature should not enact laws affecting the administration of justice in this state without conducting a judicial impact review to determine the impact that such legislation will have upon the court system, both as to cost and personnel efficiency. To my knowledge, no such study or review was conducted prior to enactment of SB 41.

¶36 To be sure, the Court should be reluctant to alter or interfere with policy decisions committed to the representative branches of government—the Executive and Legislative. These policy decisions are the primary concern and responsibility of those branches of government, and the Judiciary must refrain from interfering with them except where a clear problem of constitutional dimension is presented.

¶37 Here, despite SB 41 being a legislative regulation that clearly impacts judicial administration and appears to be a regulation committed by our Constitution to this Court's rulemaking authority, no one has considered the constitutional implications of the

18

Legislature mandating that (1) the selection of a new judge be "random," (2) the random selection means a "selection from a larger group by chance," (3) the new judge must be within close geographical proximity to the original judicial district, (4) and that the Court Administrator shall establish a random selection mechanism by October 15, 2025, just fifteen days after the effective date of the bill. 2025 Mont. Laws ch. 353. Instead of considering the impact of this monumental disruption to judicial branch administration and whether a "random selection" process was even necessary to advance legitimate legislative interests or whether it interfered with how judges were selected under the current codified court substitution rule, an August 11, 2025 memorandum was issued providing directions for implementation of SB 41 and setting forth an "Implementation Timeline." The August 11 memorandum was followed by an August 28 memorandum updating the district courts on the progress of the procedure. Neither memorandum was issued in due course by this Court, the body with rulemaking authority. This Court adopts rules through a formal legal process, not ad hoc memoranda. And the Court Administrator and the Chief Justice cannot establish a selection process for disqualified or substituted judges absent action by this Court.

¶38   I am disappointed that the authority of the Legislature to enact a bill clearly affecting judicial administration and, at best, arguably within the "twilight zone" of shared powers between the judicial and legislative branches has never been questioned. Instead, it appears the predominant question is: "How far do you want us to jump?" And the Governor would have us jump even before this Court considers the ramifications of SB 41 on judicial

administration and rulemaking. There are spheres of activity so fundamental and necessary to a court that they are inherent in its very nature as a court.

> [T]here is a third realm of judicial activity, neither substantive nor adjective law, a realm of 'proceedings which are so vital to the efficient functioning of a court as to be beyond legislative power.' This is the area of minimum functional integrity of the courts, 'what is essential to the existence, dignity and functions of the court as a constitutional tribunal and from the very fact that it is a court.' Any statute which moves so far into this realm of judicial affairs as to dictate to a judge how he shall judge or how he shall comport himself in judging or which seeks to surround the act of judging with hampering conditions clearly offends the constitutional scheme of the separation of powers and will be held invalid.[5]

While I do not opine whether the Legislature exceeded its authority by enacting SB 41, I think the question should at least be asked, and perhaps developed, whether SB 41 is within one of those spheres of activity so fundamental to the Court as to be included within its essential inherent authority.

¶39 I otherwise concur in all respects with the Court's decision.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson joins in the concurring Opinion of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON

---

[5] *Legislative Control Over Judicial Rule Making: A Problem in Constitutional Revision*, 107 U. Pa. L. Rev. 1, 31-32 (1958) (footnote citations omitted).